UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

**UNITED STATES OF AMERICA**                                             **PLAINTIFF**

**v.**

<u>**AFFIDAVIT**</u>                           5:26-MJ-5036-MAS

**JAMES TAYLOR**
   **aka J-ROCK**                                                              **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Travis R. Steward, being duly sworn, do hereby depose and state:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I am employed as a Task Force Officer (TFO) with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been such since October, 2021. I am currently assigned to the Lexington Resident Office (LRO) Enforcement Group in Lexington, Kentucky.  My current duty assignment includes, but is not limited to, investigating complex drug conspiracies, and organizations and individuals involved in the trafficking of controlled substances.  Prior to my current assignment with the DEA, I was a Police Officer for the Nicholasville Police Department for a period of approximately 6 years.  During my employment at the Nicholasville Police Department, I specifically worked narcotics investigations as a detective for approximately 1.5 years.  I am now employed by the Jessamine County Sheriff's Office and have been a narcotics detective for approximately 5 years.  I am authorized and have the responsibility to investigate persons for violations of federal law, involving the unlawful distribution of drugs, (21 U.S.C. § 841(a)(1)), attempt and conspiracy to commit the same (21

1

U.S.C. § 846), money laundering (18 U.S.C. § 1956 and 1957), and illegal possession of weapons (18 U.S.C. §§ 922 and 924(c)(1)).  In my capacity as a DEA TFO, I am authorized to arrest persons for violations of federal law, including for those offenses listed above.

2.  This affidavit is based upon my personal knowledge and upon information reported to me by other federal, state and local law enforcement officers during their official duties.  The information contained in this affidavit is not a complete account of everything known to me about this case. Rather, it contains the facts that I believe are sufficient to support a finding of probable cause.

3.  I have participated in drug investigations, including possession and distribution of fentanyl, marijuana, cocaine, heroin, methamphetamine, and other drugs. Through my training, education and experience, I have become familiar with the manner in which persons involved in the trafficking of controlled substances conduct their illicit activities, and their methods of operation and attempts to avoid detection from law enforcement.

Specifically:

a.  I have conducted street surveillance of individuals engaged in drug trafficking.  I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

b.  I am familiar with the appearance and street names of various drugs, including, heroin, fentanyl, cocaine, cocaine base (crack cocaine), methamphetamine, marijuana and other substances;

c.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

    d.  I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

    e.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

    f.  I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry; and

    g.  I have consulted with Special Agents and Task Force Officers who have extensive experience in this field, and they have provided me with guidance and knowledge regarding surveillance operations and drug investigations

    h.  I have worked in an undercover capacity in order to identify targets of investigations related to drug trafficking.

4.    The investigation to date indicates that there is probable cause to believe that on both February 18th, 2026 and February 26th, 2026 in Fayette County, in the Eastern District of Kentucky, James TAYLOR knowingly and intentionally distributed 50 grams or more of actual methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). The following facts support the finding of probable cause.

## PROBABLE CAUSE

5.    During the month of February 2026, members of the DEA LRO along with the Kentucky State Police (KSP) began an investigation into James Taylor who was identified as a significant distributor of methamphetamine and fentanyl in the central Kentucky area. Members of the Kentucky State Police learned of Taylor and his drug trafficking through a confidential source who knew Taylor as "J-Rock". Your affiant had also been in communication with a

separate Lexington Police Department confidential source who had advised the same information regarding "J-Rock" and his drug trafficking activities and advised that Taylor was supplied narcotics from Detroit, Michigan. Both of these confidential sources identified "J-Rock" as Taylor via a redacted photograph of James Taylor. During the month of February 2026, members of the DEA LRO identified several residences/apartments that Taylor frequented, and it appeared that Taylor was actually residing at the Clarion Hotel located on Newtown Pike. Members of the DEA utilized various surveillance methods to surveil Taylor including cellular device geo-location pings for Taylor's telephone 313-300-8538 and a GPS tracking device on Taylor's Toyota Camry.

6. During the course of this investigation your affiant identified that James Taylor was a wanted fugitive for three state of Kentucky cases. Your affiant confirmed these warrants for Taylor's arrest through the Kentucky Ewarrant system. Taylor had warrants for his arrest for the following charges: 1) Fayette County warrant of arrest for Possession of Handgun by Convicted Felon and Fleeing or Evading Police 3rd degree, 2) Clark County Bench warrant for failure to appear for trafficking fentanyl, tampering with physical evidence, fleeing or evading police 2nd degree and Persistent Felony Offender II, 3) Jessamine County bench warrant for failure to appear for Trafficking fentanyl, Trafficking heroin, possession of handgun by convicted felon, tampering with physical evidence and drug paraphernalia. James Taylor has two prior trafficking convictions out of the state of Kentucky. One conviction for Trafficking Heroin in 2017 in Scott County (17-CR-00112) and a conviction for Trafficking Cocaine in 2019 in Fayette County (19-CR-00184).

7. On February 13th, 2026, your affiant applied for a state of Kentucky search warrant to obtain live geo-location data for Taylor's cellular device that is mentioned above through the

4

service provider Verizon. The search warrant was signed by Jessamine County Circuit Court Judge Hunter Daugherty and was executed on February 15th, 2026, by serving the order on service provider Verizon.

8. On February 16th, 2026, your affiant applied for a state of Kentucky search warrant to affix a GPS tracking device to a 2018 Toyota Camry (Kentucky registration A4R170). Through the course of this investigation your affiant identified this vehicle as being a private rental vehicle that was being utilized by Taylor. The search warrant was signed by Jessamine County Circuit Court Judge Hunter Daugherty. On February 17th, 2026, your affiant located the vehicle in Lexington, Ky and executed the search warrant by affixing a GPS tracking device to the vehicle.

9. On February 17, 2026, a Kentucky State Police CS was in communication with James Taylor via telephone number 313-300-8538. CS arranged the purchase of one-pound of methamphetamine from Taylor for $2,500. CS arranged for the transaction to occur on the following date and the CS advised Taylor that CS would be sending a friend to Lexington, Kentucky to meet Taylor to conduct the transaction. These communications were witnessed by Detectives and are recorded and preserved.

10. On the following date, February 18th, 2026, CS was in communication with Taylor about conducting the one pound purchase of methamphetamine and the transaction location was set for Arby's parking lot located at 3391 Tates Creek Road in Lexington, Kentucky. At this time, a Kentucky State Police Detective acted in an undercover capacity as the CS's "friend" and traveled to Arby's to conduct the methamphetamine transaction with Taylor. Prior to the KSP

undercover detective arriving to Arby's, members of the DEA conducted surveillance at the Clarion Hotel to locate Taylor.

11. At approximately 1:30 p.m., your affiant arrived to the Clarion Hotel at 1950 Newtown Pike Lexington, Kentucky. TFO Steward had observed that Taylor's 2018 Toyota Camry (Ky registration A4R170) was present at the hotel due to the court ordered tracking device affixed to the Camry. TFO Steward also observed at approximately 1:35 p.m. that the court ordered phone geo-location for Taylor's 313-300-8538 device was showing in the area of the Clarion Hotel (latitude 38.096932, longitude -84.481934 with a radius of approximately 1709 meters). Your affiant arrived and located the vehicle parked near the front door of the Clarion Hotel.

12. At approximately 2:14 p.m., your affiant observed Taylor exit the Clarion Hotel and entered into the driver seat of the Toyota Camry. Your affiant observed Taylor to be wearing a beige hoodie sweatshirt and jeans. Your affiant clearly observed that this male was Taylor prior to entering the Camry. Taylor was then observed leaving the area and mobile surveillance was established on Taylor.

13. While members of the DEA were conducting surveillance of Taylor, KSP DESI West Sgt. Welch and DEA TFO Trevor Harris met with the undercover KSP Detective at a pre-determined location. During the meeting, TFO Harris provided the Detective with two covert recording devices and $2,500 in KSP official funds. The Detective then traveled to the deal location of Arby's and arrived at approximately 2:52 p.m. The Detective then parked in the parking lot and waited for Taylor to arrive.

14. At approximately 3:43 p.m., Special Agent Chris Hill observed the Toyota Camry arrive at Arby's being operated by Taylor and parked directly beside the Detective. At approximately 3:44 p.m., Taylor was observed exiting from the driver's seat of the Toyota Camry and opening the passenger door of the Detective's vehicle. Taylor utilized a face mask to block his face during the transaction but was wearing the exact same clothing as when your affiant observed Taylor leave the Clarion Hotel. Taylor then sold the Detective approximately 453 grams of methamphetamine for $2,500. Taylor then re-entered the driver's seat of the Toyota Camry and backed from the parking space. The Detective then cleared from the area and met with investigators to be de-briefed and to transfer custody of the purchased methamphetamine. The Detective advised after Taylor arrived, he remained in his vehicle and was observed pulling a white hoodie up and adjusting a red bandana across his face. The Detective advised Taylor handed her the ziploc baggie containing the methamphetamine. The Detective could only see Taylor's eyes. The Detective provided the KSP buy money to Taylor in exchange for the methamphetamine. The controlled purchase was video and audio recorded and the recordings are preserved. Members of the DEA maintained constant surveillance of Taylor in the Camry from the time Taylor was observed leaving the Clarion Hotel until the controlled purchase at Arby's ensuring that it was in fact Taylor who conducted the one-pound methamphetamine transaction.

15. The Detective then transferred custody of the 453 grams of methamphetamine to DEA TFO Trevor Harris. TFO Harris then utilized a Tru-Narc testing device to test the methamphetamine. The Tru-Narc test produced an alarm for methamphetamine. This field test kit is a past proven and reliable field test kit and is commonly used by the Drug Enforcement Administration in the regular course of drug investigations. Your affiant has since sent the

methamphetamine to the DEA Mid-Atlantic Lab and received the results. The methamphetamine purchased on February 18th, 2026 from James Taylor is approximately 353.3 grams of actual pure methamphetamine hydrochloride. The total weight of the exhibit was 447.3 grams with a purity of 79%.

16. On February 25th, 2026, DEA TFO Trevor Harris communicated with KSP DESI West Confidential Source (CS). The CS had communicated via voice calls with Taylor via telephone number 313-300-8538 on this date arranging another purchase of one pound of methamphetamine for $2,500. During the communication, the CS advised that his/her "friend" would travel to Lexington to purchase one pound of methamphetamine. The transaction was arranged to occur at the Arby's on Tates Creek Road the following day. Like the previous purchase, the "friend" was arranged to be the undercover KSP detective.

17. On February 26, 2026, prior to the undercover buy from Taylor, KSP DESI West Sgt. Welch and TFO Harris met with the Detective at a pre-determined meet location. During the meeting, TFO Harris provided the Detective with $2,500 in pre-recorded buy money. TFO Harris also provided the Detective with two covert audio / video recording devices for the transaction. One of the covert devices provided a live video / audio / GPS feed for detectives to monitor.

18. On February 26, 2026, at 11:58 a.m., TFO Harris received a call from the CS advising Taylor contacted the CS via voice call and wanted CS's "friend" to meet Taylor at Cheddar's restaurant located on Walden Drive. TFO Harris then notified the Detective the meet location was moved to Cheddar's. The Detective traveled to Cheddar's and staged in the back parking lot area

awaiting Taylor's arrival. KSP Sgt. Welch and TFO Harris, along with DEA TFO Josh Baker, also traveled to the area of Cheddar's to conduct surveillance.

19. Prior to this controlled purchase, members of the DEA Lexington Resident Office attempted to locate Taylor. Members of the DEA traveled to 493 W Third Street to locate Taylor. Your affiant monitored the court ordered tracking device that was affixed to Taylor's Toyota Camry (Ky registration A4R170) and observed the vehicle to be parked behind 493 W Third Street. This was a known location that Taylor frequented and a possible stash location for his narcotics. Taylor has been observed utilizing a key to lock the door at this apartment marked units "2-3" but does not appear to reside or even hang out at for long periods of time. Your affiant began reviewing the court ordered telephone ping for Taylor's device (313-300-8538) and observed the device to be in the area of this residence (latitude 38.056935, longitude -84.485195 with a radius of approximately 1164 meters) at approximately 11:06 a.m.

20. At approximately 11:11 a.m., SA Jason Moore observed James Taylor exit 493 W Third Street out of the door labeled "2-3" wearing a black hoodie with the phrase "That's a awful lot of cough syrup" on the front of the sweatshirt. SA Moore observed Taylor utilizing a key to lock the door and walked behind the building to his White Toyota Camry. The vehicle then left the area with Taylor being the passenger in the vehicle with an unknown driver that was already in the vehicle upon SA Moore's arrival to the location. Members of the DEA then conducted mobile surveillance of Taylor. SA Jason Moore obtained video recording of Taylor leaving the apartment and clearly identified him as James Taylor.

21. Members of the DEA maintained constant surveillance of the vehicle until the Camry arrived at Cheddar's located at 3604 Walden Drive Lexington, Kentucky. At approximately 12:09 p.m., DEA TFO Scott Mcintosh observed the Toyota Camry arrive and park next to the KSP undercover vehicle that was occupied by the KSP Detective in Cheddar's parking lot. At this time TFO Mcintosh observed Taylor exit the passenger side of the Camry. At this time Taylor reached through the passenger side window of the undercover vehicle and provided the Detective with a Starbucks bag which contained a plastic bag containing approximately 453 grams of methamphetamine. The Detective then provided Taylor with $2,500 of official funds. Taylor had a black face covering on with only his eyes showing. Taylor was then observed entering back into the passenger seat of the Toyota Camry and left the area as the passenger in the Camry. Like the first controlled purchase from Taylor on February 18th, 2026, members of the DEA maintained constant surveillance of Taylor prior to him conducting the methamphetamine transaction while wearing a face mask which ensures that Taylor was the individual wearing the face mask conducting the one-pound transaction.

22. The Detective then cleared from the area and met with investigators to be de-briefed and to transfer custody of the purchased methamphetamine. The Detective advised after Taylor arrived, he exited the Camry with a face covering and conducted the methamphetamine transaction with the methamphetamine being inside of a Starbuck's bag. The Detective provided the KSP buy money to Taylor in exchange for the methamphetamine. The controlled purchase was video and audio recorded and the recordings are preserved.

23. The Detective then transferred custody of the 453 grams of methamphetamine to DEA TFO Trevor Harris. TFO Harris then utilized a Tru-Narc testing device to test the methamphetamine. The Tru-Narc test produced an alarm for methamphetamine. This field test kit is a past proven and reliable field test kit and is commonly used by the Drug Enforcement Administration in the regular course of drug investigations. Your affiant has since sent the methamphetamine to the DEA Mid-Atlantic Lab and received the results. The methamphetamine tested positive as 340.4 grams of actual pure methamphetamine. The total weight was 448 grams, with a purity of 76%.

24. On March 4th, 2026, your affiant was monitoring the live telephone geo-locations for Taylor's device and observed Taylor's device to be traveling south from Detroit, Michigan. Due to prior intelligence received from a qualified confidential informant about Taylor being supplied narcotics in Detroit Michigan, your affiant believed that Taylor was traveling back to Lexington, Kentucky with a narcotics load to distribute upon arriving to Lexington. Members of the DEA had identified a vehicle that Taylor had likely traveled to Detroit, Michigan in, a white 2026 GMC Terrain with Kentucky registration T5G888. Members of the DEA then traveled to Florence Kentucky to attempt to locate and intercept this vehicle. Your affiant utilized a reliable law enforcement database and observed this vehicle to be consistent with Taylor's cellular device geo-locations the entire trip to Michigan and back to Kentucky indicating that Taylor was the occupant of the vehicle. At approximately 7:44 a.m., DEA TFO Josh Baker located the above 2026 GMC Terrain traveling south on I-75 near Williamstown Ky. Your affiant was monitoring the device locations of Taylor's device and observed it to still be consistent with the travel of the GMC SUV. Due to Taylor having three Kentucky warrants for his arrest, members of Kentucky State Police

then initiated a traffic stop of the GMC SUV in a marked patrol cruiser. Upon KSP making contact with the driver, James Taylor, he provided a fake identity drivers license and there was a female occupant in the vehicle. This male driver was confirmed to be James Taylor and he was placed under arrest for his open Kentucky Warrants for his arrest. A search of Taylor's person was conducted and located was $10,000 in US currency. A KSP K-9 was utilized for an exterior sniff of the vehicle and indicated a positive alert of narcotics odor coming from within the vehicle. A search of the vehicle was conducted and located inside of the vehicle were two handguns and a black sweat jacket with "That's a awful lot of cough syrup" lettering on it. This was significant due to the second controlled methamphetamine purchase from Taylor because he conducted the transaction while wearing this jacket with the same lettering.

25. On this same date, March 4th 2026, your affiant spoke with a cooperating source who advised that Taylor utilizes an apartment beside the Green Lantern Bar (493 W Third Street) to store narcotics there. CS advised that Taylor utilizes a female named "Brittany" to store the narcotics there and to sell them for Taylor. This was all consistent with previous surveillance efforts and information from sources indicating that Taylor utilizes 493 W Third Street to store/sell narcotics from. CS advised that Taylor utilized apartment #2 which is upstairs and through the common door labeled "2-3" and that it is the first apartment upon going upstairs. This again was consistent with members of the DEA observing Taylor utilize a key to lock the common door labeled "2-3".

26. On this same date, TFO Mcintosh contacted the reliable source of information that he had received information from previously regarding Taylor and 493 W Third Street. This reliable source of information advised that Taylor's apartment is through the common door labeled "2-3" on the front left of the building. The reliable source of information then advised TFO Mcintosh

that you have to go upstairs and then Taylor's apartment is the first door on the right labeled apartment #2. TFO Mcintosh was advised by the source of information that in the past, the source had purchased fentanyl and methamphetamine from Taylor inside of apartment #2. This again confirms the above information regarding 493 W Third Street apt #2 being utilized by James Taylor to sell/store narcotics there

27. On March 4th, 2026, your affiant applied for a state of Kentucky search warrant to search 493 W Third Street apartment #2. The search warrant was signed by Fayette County District Court Judge Melissa Murphy. Members of the DEA then executed the search warrant by searching the premises of apartment #2. The apartment was found to be unoccupied, but evidence of drug trafficking was seized. Located in the apartment was a beige hooded sweatshirt, this is significant due to it matching the sweatshirt that Taylor was wearing during the first controlled methamphetamine purchase from Taylor on February 18th, 2026. Also located in the apartment was approximately 70 grams (gross weight in packaging) of brown powder in a ziplock bag. This brown powder was later field tested by DEA TFO Trevor Harris utilizing a reliable field testing device which produced an alarm for fentanyl. Also located in a back bedroom was a yellow MSM bucket which is a horse supplement that is commonly used as a cutting agent for methamphetamine. Also located were numerous drug trafficking paraphernalia such as vacuum sealed bags, blender with residue, a money counter, clear plastic bags with residue, a digital scale. Also located was a rifle magazine containing 24 rifle rounds. A bill of sale for a vehicle was located and listed on the bill of sale was James Taylor's name with a listed address of 493 W Third Street with a date of birth of 05/04/1993. This was significant because it matches the identifiers of James Taylor. Located just outside of the apartment door was a trash bag containing numerous

13

used vacuum sealed bags.  All of the items listed above are consistent with this address being utilized by James Taylor to further his narcotics trafficking activities.

25. In conclusion, members of the DEA LRO identified James Taylor, aka "J-Rock," as a significant narcotics trafficker.  Members of the DEA and KSP had multiple confidential sources providing the same information about "J-Rock", that "J-Rock" was a large scale narcotics dealer operating in Lexington.  Members of the DEA and KSP then were able to introduce an undercover detective and made two successful controlled purchases of methamphetamine from Taylor for approximately 453 grams of methamphetamine for each of the controlled purchases.  These controlled purchases were audio/video recorded, and it is James Taylor who conducted these methamphetamine transactions with the KSP undercover detective on February 18th, 2026 and February 26th, 2026. Members of the Kentucky State Police conducted a traffic stop of Taylor and he was found to be in possession of $10,000 on March 4th, 2026.  On the same date, members of the DEA executed a search warrant at Taylor's associated apartment located at 493 W Third Street #2 and seized numerous items consistent with narcotics trafficking along with suspected fentanyl.

## **CONCLUSION**

26. I believe that the facts set forth above support that there is probable cause to believe that on or about February 18th, 2026 and February 26th, 2026, Fayette County, in the Eastern District of Kentucky, James Taylor did knowingly and intentionally distribute 50 grams or more of actual methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

I declare under the penalty of perjury that the above statement is true and correct to the best of my knowledge, information, and belief.

/s/ Travis Steward
Travis R. Steward, Task Force Officer
Drug Enforcement Administration

Sworn to me and subscribed by telephone in accordance with Fed. R. Crim. P. 4.1 and 41(d)(3) on the 6th day of March, 2026.

_____
UNITED STATES MAGISTRATE JUDGE